## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | | |
|---|---|---|
| EUGENE GAMBOA OTHON, JR. and KRISTA L.K. OTHON, *Individually and as next friends of* ISABELLA S. OTHON, LILLIA R. OTHON and OLIVIA T. OTHON, *minor children;* and DR. MARK LEDING,<br><br>**Plaintiffs**<br><br>vs.<br><br>THE BON-TON DEPARTMENT STORES, INC., *Individually and d/b/a* "LIVING QUARTERS" & "YOUNKER'S"<br><br>**Defendant** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 4:11-cv-00379-RP-CFB<br><br>"Diversity" / Jury<br><br><br><br>**PLAINTIFFS' THIRD AMENDED COMPLAINT & JURY DEMAND** |

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW EUGENE GAMBOA OTHON, JR. ("Plaintiff-GENE OTHON"); his wife, KRISTA L. K. OTHON ("Plaintiff-KRISTA OTHON"); their minor children, ISABELLA S. OTHON, LILLIA R. OTHON and OLIVIA T. OTHON (hereinafter identified by name or collectively described as the "OTHON children"); and DR. MARK LEDING ("Plaintiff-DR. LEDING), collectively described as "Plaintiffs" herein, complaining of THE BON-TON DEPARTMENT STORES, INC., *Individually and d/b/a* "LIVING QUARTERS" & "YOUNKER'S", hereinafter identified by name or described as "Defendant," and for cause of action Plaintiffs would respectfully show unto the Court and Jury as follows:

### PARTIES

1.      Plaintiffs are all citizens and residents of the State of Iowa.



PLAINTIFF'S
EXHIBIT
1

2.      Defendant-THE BON-TON DEPARTMENT STORES, INC., *Individually and d/b/a*

"LIVING QUARTERS" & "YOUNKER'S" (hereinafter, "Defendant" or "BON-TON") is a foreign

[Pennsylvania] corporation whose principal place of business is located in York, PA. See, *para. 5,*

*infra.* At all times material to the allegations contained in this Complaint, Defendant-BON-TON

was and is in the business of designing, manufacturing, marketing, promoting, advertising, and

selling goods through its "Bon-Ton," "Bergner's," "Boston Stores," "Carson Pirie Scott," "Elder-

Beerman," "Herberger's," "Parisian," and "Younker's" store divisions/nameplates, including the

"Living Quarters" company brand "Large Blue Fire Crock" (hereinafter, the "firepot" or the "firepot

in question") and the Bird Brain, Inc. "Firepot Fuel Gel" (hereinafter, the "fuel gel") made the basis

of this lawsuit. Defendant transacts business in the State of Iowa and derives substantial revenues

from business in the State of Iowa. *This Defendant has appeared and answered herein. No service*

*is necessary at this time.*

**JURISDICTION**

3.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1332(a)(1), because

the Plaintiffs and Defendant are citizens of different states, see, *para. 2, supra,* & *para. 5, infra,* and

the amount in controversy exceeds $75,000.00, excluding interest and costs.[1]

**VENUE**

4.      At all times material to this cause, Plaintiffs were residents of the federal judicial

region known as the Southern District of Iowa.

5.      Defendant is incorporated in Pennsylvania and its principal place of business is

---

[1] As partial proof of Plaintiffs' damages, Plaintiff-GENE OTHON avers that he has incurred in excess of $300,000.00 in medical expenses to date, all of which are associated with the treatment of his third-degree burns and the performance of grafting surgeries, all of which resulted from the incident made the basis of this lawsuit.

located in York, PA.

6.      At all times material to this cause, Defendant operated (and still operates) numerous "Younker's" and "Herberger's" stores in Iowa, including at least four (4) "Younker's" stores in Des Moines, IA and West Des Moines, IA.

7.      Defendant markets, distributes and sells its private brand products and those of third-parties – including, but not limited to, the private brand fire crock and "Bird Brain" fuel gel made the basis of this lawsuit -- throughout the State of Iowa, including but not limited to the aforementioned "Younker's" stores.

8.      Pursuant to 28 U.S.C. §1391(c), because of the Defendant's aforementioned numerous and substantial contacts within the Southern District of Iowa, Defendant is deemed to reside in the Southern District of Iowa.

9.      As a consequence, as between the parties to this litigation and pursuant to 28 U.S.C. §1391(a), venue is proper with the Honorable Court.

## OPERATIVE FACTS

10.      At the time of the incident made the basis of this lawsuit, BON-TON owned and operated approximately 270 stores across – and employed approximately 30,000 employees in – nearly half the states of this nation.

11.      At no time relevant to this cause did BON-TON have a Safety Department or any other similar department, division or personnel to oversee the quality, characteristics and safety of the products it was selling from third-party manufacturers.

12.      After discovering the existence of an outdoor living product known as a "firepot" which burned pourable fuel gel and, thereby, created a decorative flame, BON-TON created a "fire

3

crock" of its own through its private label division and began selling its "Living Quarters" fire crocks alongside and in conjunction with pourable fuel gel manufactured by "Bird Brain, Inc."

13.     According to the Consumer Product Safety Commission (hereinafter, "CPSC") and news reports from around the country, the "Bird Brain" fuel gels distributed by Defendant, and similar fuel gels manufactured and sold by Napa Home & Garden (hereinafter, "NAPA") and others, caused dozens of fuel gel flash fire explosions between December 2009 and July 14, 2011.

14.     On or before June 11, 2011, dozens of consumers had been injured while using decorative firepots, fire crocks and the pourable fuel gel used in them.

15.     On or before June 11, 2011, Defendant was made aware of the fact that injuries from the use of these products were being reported around the country.

16.     On or about June 13, 2011, "Bird Brain" advised BON-TON that its products were different than the products which were being recalled (for example, by NAPA), but "Bird Brain" also acknowledged that it was sending out additional warnings to be placed on BON-TON's existing stock of "Bird Brain" pourable fuel gel.

17.     When "Bird Brain" failed to send the additional warnings stickers to BON-TON, BON-TON never asked for them when they failed to receive them.

18.     On or about June 14, 2011, the CPSC warned consumers in that its investigation had by then revealed "burn and poisoning hazards that can occur from using illuminating fuels in firepots . . . ."

19.     On or about June 14, 2011, the Illinois Attorney General issued an "Urgent Alert" directing retailers to immediately cease the sale of firepots, fire crocks and the associated pourable fuel, regardless of manufacturer.  The June 14, 2011 Illinois Attorney General "Urgent Alert"

4

actually contained photos of fuel gel manufactured by "Bird Brain".

20.     As of June 14, 2011, BON-TON had sold approximately $334,000.00 of the category of firepots, fire crocks and pourable fuel gel, and it had approximately $654,000.00 in additional inventory on hand.

21.     Despite having actual or constructive knowledge of the "Urgent Alert" issued by the Illinois Attorney General on June 14, 2011, BON-TON continued to sell firepots, fire crocks and fuel gel at all its stores, including those in Illinois.

22.     On or before June 15, 2011, BON-TON received an email that made it aware of the fact that Bed, Bath & Beyond ("BBB") – a competitor – was immediately ceasing the sale of all firepots, fire crocks and pourable fuel gel.

23.     On or before June 15, 2011, Defendant was aware of the foreseeable, specific harm associated with the use of these products and made the basis of this lawsuit, i.e., that consumers were pouring fuel onto open flames in the firepots or fire crocks.

24.     On June 16, 2011, at the direction of its Legal Department, BON-TON ceased the sale of all firepots, fire crocks and pourable fuel gel in all of its stores, including but not limited to those in Iowa and Illinois.

25.     On June 17, 2011, BON-TON started seeking information regarding the Illinois Attorney General's "Urgent Alert" and the status of the CPSC investigation into firepots, fire crocks and pourable fuel gel.

26.     On June 20, 2011, BON-TON learned that, contrary what its vendor, "Bird Brain", was saying to its customers, the CPSC did not feel there was clear distinction between the different formulations of pourable fuel gel.

5

27.     On June 20, 2011, BON-TON learned that the CPSC was actively investigating the entire category of firepots, fire crocks and pourable fuel gel.

28.     On June 20, 2011, BON-TON was advised by its VP Quality Assurance (Bill Grange) that it needed to wait for the CPSC to complete its investigation before again selling firepots, fire crocks or pourable fuel gel.

29.     On June 20, 2011, the CPSC conducted testing of the "Bird Brain" and "Napa" fuel gels by burning them in firepots.

30.     On June 20, 2011, the CPSC identified the reasons consumers were pouring fuel gel on open flames in firepots and fire crocks.

31.     Notwithstanding the fact that BON-TON was aware of the fact that consumers were pouring fuel gel on open flames in firepots and fire crocks, BON-TON did not call the CPSC to check the status or results of its investigation prior to its decision to resume the sale of these products.

32.     On June 22, 2011, in response to receiving such notice of burns caused by its products, NAPA formally recalled its fuel gel, ordered its retailers to remove their stock of NAPA fuel gel from store shelves, instructed consumers to stop using NAPA fuel gel, and started issuing refunds to consumers who returned their NAPA fuel gel.

33.     On June 22, 2011, the New York Times published an article regarding the recall of NAPA's products, and this article specifically referenced the fact that "Bird Brain" products were also implicated in these burn events which prompted the recall of the NAPA products.

34.     On or before June 24, 2011, "Bird Brain" told BON-TON that it was working on alternate methods for fueling firepots "in case something happens with the gel category as a whole."

6

35.     Between June 16-30, 2011, BON-TON made no attempt to independently investigate the hazards posed by firepots, fire crocks and pourable fuel gel.

36.     Between June 16-30, 2011, BON-TON did not contact the CPSC or the representatives of NAPA to determine the details of the NAPA recall, including but not limited to the information underlying the decision to issue the recall.

37.     Between June 16-30, 2011, BON-TON did not contact the CPSC to determine the nature, scope or amount of other similar incidents that had been reported, including but not limited to the June 9, 2011 report filed by Omaha Fire Department.

38.     Notwithstanding the fact that it was aware of the foreseeable hazards associated with the use of these products, the Illinois Attorney General had commanded the cessation of sales of these products, the Illinois Attorney General was not going to change her position on her "Urgent Alert," the CPSC was actively investigating the entire category of these products, the CPSC did not see a relevant difference in the ethanol vs. isopropyl formations of fuel gel, and BON-TON's own Vice President of "Quality Assurance" had counseled against the sale of these products before the CPSC completed its investigation, on or about June 30, 2011, the "Legal Department" of BON-TON permitted the resumption of sales of firepots, fire crocks and fuel gel in all of its stores.

39.     The Fourth of July weekend was a big weekend for sales of outdoor living items at BON-TON's stores, and BON-TON was eager get its inventory of firepots, fire crocks and fuel gel on the sales floor in advance of the weekend.

40.     On or about July 14, 2011, Plaintiffs-LEDING purchased the firepot and fuel gel in question from BON-TON's "Younker's" store.

41.     Thereafter, on or about August 1, 2011, Plaintiffs were gathered at the LEDING-

7

Plaintiffs' home in Clinton, IA and burning the subject fuel gel in the metal fuel gel reservoir provided with the subject firepot. After the fuel gel burned down and thereby apparently extinguished the firepot flames, Plaintiff-DR. LEDING attempted to refill the fuel gel reservoir in the firepot. However, as Plaintiff-DR. LEDING poured the fuel gel into the fire pot reservoir, the fuel gel ignited suddenly and unexpectedly, the flames rapidly moved up the stream of fuel gel and into plastic container of fuel gel, the sudden pressure of the fire in the container caused the burning fuel gel to suddenly discharge out of the fuel gel's pour spout, and the flaming fuel gel was thereby expelled upon Plaintiff-GENE OTHON's body, thereby resulting in serious burn injuries to his head, face, neck, arms, torso and body generally.

42.     As Plaintiff-GENE OTHON's body and clothing were burning extensively, Plaintiff-DR. LEDING and another friend in attendance (Wes Unke) used their hands to extinguish the flames and remove the burning clothing from Plaintiff-GENE OTHON. In so doing, Plaintiff-DR. LEDING and Mr. Unke suffered burns to their bodies as well.

43.     When the incident occurred, Plaintiff-KRISTA OTHON was standing within several feet of the fire and experienced the event firsthand.

* * *

## DIVISION I –
## CAUSES OF ACTION AGAINST DEFENDANT-BON-TON

### COUNT I –

### NEGLIGENCE

44.     Defendant committed acts of omission and commission, which collectively and severally constituted negligence, and which proximately caused the incident and Plaintiffs' injuries

and damages. The acts or omissions of Defendant constituting negligence include, but are not limited to, the following:

(A)     Failure to properly warn of the dangerous propensity of the subject fire crock to unexpectedly ignite and/or the conditions under which such an ignition could occur;

(B)     Negligently designing the fire crock which caused the fire crock to have the propensity to unexpectedly ignite;

(C)     Failing to adequately test the burning of pourable fuel gel in the fire crocks and firepots sold by BON-TON;

(D)     Failing to adequately test the refilling of firepots or fire crocks after recent use;

(E)     Failing to properly test the subject fire crock and/or failing to ensure proper testing of the subject fire crock by third-parties to whom the obligation to test was delegated, both prior to original marketing and BON-TON became aware of circumstances giving rise to the need for additional testing prior to again marketing the subject fire crock for sale;

(F)     Negligently marketing the fire pot, both originally and after BON-TON became aware of circumstances that would cause a reasonably prudent retailer to abstain from the further sale of the subject fire crock and associated fuel gel;

(G)     Failure to request and apply the additional warnings created by "Bird Brain" and known to BON-TON, regardless of their adequacy;

9

(H)     Failure to properly warn of the danger of ignition caused by pouring fuel gel on the invisible or nearly invisible flames, or residual embers, created by the usual burning of fuel gel in the fire crock reservoir;

(I)     Failing to have a safety department or other appropriate personnel to oversee the safety of goods and services marketed by BON-TON;

(J)     Failing to create, adopt, implement and/or follow adequate policies and procedures designed to ensure that the goods being marketed for sale by BON-TON were, in fact, of the kind, quality and character that could and should be sold by a reasonably prudent retailer;

(K)     In selling the subject fire crock and associated fuel gel when a reasonably prudent retailer would not have;

(L)     In failing to seek and obtain readily-available information about the relative safety and suitability for sale of the subject fire crock and associated fuel gel from sources known to possess such information, including but not limited to the Consumer Product Safety Commission (CPSC);

(M)     In failing to wait for the CPSC to conclude its testing of firepots, fire crocks and fuel gel prior to again marketing the subject fire crock and associated fuel gel for sale;

(N)     In general, in resuming the sale of the subject fire crock and associated fuel gel, notwithstanding BON-TON's actual and constructive knowledge of the dangers posed by these products; and,

(O)     Regardless of the actions or inactions of others, BON-TON's failure to

10

exercise its available last clear chance to avoid the dangers posed by the products in question, and the injuries resulting therefrom.

45.     The negligence of BON-TON was the cause of the incident, and Plaintiffs' injuries and damages would not have happened except for the negligence of said Defendant as it relates to the subject fire crock and fuel gel.

46.     The injuries and damages sustained by Plaintiffs are within the scope of BON-TON's liability, and said injuries and damages arose from the same general types of danger that BON-TON should have taken reasonable steps to avoid.

## COUNT II –
## FAILURE TO WARN

47.     The subject fire crock, was originally designed, manufactured, sold and/or placed into the stream of commerce by Defendant. At the time of the sale of the subject fire crock, Defendant was in the business of designing, manufacturing, selling and/or distributing goods such as the subject fire crock. When the subject fire crock left the control of Defendant, the subject fire crock was defective and unreasonably dangerous because it contained warnings insufficient to alert users or consumers of the dangers and risks associated with its use, including but not limited to the risk of unexpected ignition resulting from pouring fuel gel into a hot fire crock reservoir. Defendant failed to give adequate warnings of such risks, which were known or by the application of reasonably developed human skill and foresight should have been known. Defendant further failed to give adequate instructions to avoid such dangers, which failure rendered the subject fire crock unreasonably dangerous as marketed. Defendant further failed to give warnings and instructions in a form that could reasonably be expected to catch the attention of a reasonably prudent person in the

11

circumstances of the fire crock's use, and the content of the warnings and instructions was not comprehensible to the average user and did/does not convey a fair indication of the nature and extent of the danger and how to avoid it to the mind of a reasonably prudent person. Acts or omissions of Defendant which constitute marketing defects include, but are not limited to, the following:

(A)     Failure to properly warn of the catastrophic consequences of unexpected ignition of the fuel gel;

(B)     Failure to properly warn of the catastrophic consequences of pouring fuel gel into the fire crock reservoir;

(C)     Failure to properly warn of the catastrophic consequences of pouring fuel gel into the fire crock reservoir and the attendant potential for unexpected ignition;

(D)     Failure to properly warn that the fuel gel could unexpectedly ignite during normal foreseeable use of the fire crock;

(E)     Failure to request and apply the additional warnings created by "Bird Brain" and known to BON-TON, regardless of their adequacy;

(F)     Failure to properly warn of the danger of ignition caused by pouring fuel gel on the invisible or nearly invisible flames, or residual embers, created by the usual burning of fuel gel in the fire crock reservoir;

(G)     Failing to warn against refilling for a period of time after the apparent extinguishment of the flames sufficient to protect against the unexpected ignition of the fuel gel upon refilling;

(H)     Failing to warn of the need to use the snuffer, even when the flame appeared

to be extinguished, if it was prudent to provide such additional warnings; and,

(I)    Failing to warn against refilling until the reservoir was cool to the touch.

48.    Defendant's failure to provide adequate warnings and instructions rendered the subject fire crock dangerous to an extent beyond that which would be contemplated by an ordinary user or consumer with ordinary knowledge common to the community as to the product's characteristics.  The user or consumer used the subject fire crock for its intended and foreseeable purpose.

49.    The defective marketing, warnings and instructions relating to the subject fire crock was the cause of the incident, and Plaintiffs' injuries and damages would not have happened except for the defective marketing, warnings and instructions attending the subject fire crock.

50.    The injuries and damages sustained by Plaintiffs are  within the scope of BON-TON's liability, and said injuries and damages arose from the same general types of danger that BON-TON should have avoided through safe and proper marketing, warnings and instructions relating to the subject fire crock and associated risks and hazards.

* * *
## DIVISION II – DAMAGES

### PHYSICAL PAIN, SUFFERING & MENTAL ANGUISH

51.    In the incident of August 1, 2011, out of which this suit arises, Plaintiffs suffered various injuries to their bodies and minds.  The injuries of Plaintiffs have caused them to suffer physical pain, suffering and mental anguish, and Plaintiffs will, in all reasonable probability, continue to experience such physical pain, suffering and mental anguish for a long time in the future.

52.    If it be found that Plaintiffs were suffering from any predispositions, conditions or

13

bodily infirmities prior to the date of the incident, Plaintiffs would show unto the Court and jury that the same were neither disabling nor painful, but that as a result of the injuries suffered by Plaintiffs on such occasion, and the effects thereof, the same had been aggravated and made worse, and caused to become disabling and painful.

## LOST WAGES & LOSS OF WAGE-EARNING CAPACITY

53.     Many of the Plaintiffs were gainfully employed at the time of the incident in question, but they are unable to do the work they were accustomed to doing because of their physical and/or psychological injuries.

54.     Such work as Plaintiffs have been able to do, and will be able to do in the future, have been or will be done under the handicap of pain, suffering and mental anguish.

55.     For the balance of their lives, it is reasonably probable that Plaintiffs will suffer physical impediments and, thus, their earning capacity will be diminished. These injuries, and the effects thereof, are in reasonable probability of a lasting nature and will handicap Plaintiffs for the balance of their lives.

## REASONABLE & NECESSARY MEDICAL CARE IN THE PAST & FUTURE

56.     On account of the nature, seriousness, and severity of Plaintiffs' injuries, Plaintiffs have required medical care and counseling. Plaintiffs have been required to pay and incur liability to pay the charges which have been and will be made for such medical and/or counseling services. It is reasonably probable that Plaintiffs will require additional attention for medical care, counseling, nursing, and/or hospital services and that Plaintiffs will be required to pay and incur liability to pay the charges which will be made for such services.

57.     The charges which have been and will be made for services rendered to Plaintiffs

have represented and will represent the usual, reasonable, and customary charges for like or similar services in the vicinity where they have been and will be rendered. All of these services, both past and future, have been and will be made necessary in connection with the proper treatment of the injuries sustained by Plaintiffs as a result of this particular incident.

58.    Plaintiff-GENE OTHON is a veteran of the United States' military and, as such, has been entitled to receive and has received medical treatment through the Veterans' Administration. Therefore, as a result of said injuries, Plaintiff-GENE OTHON has received and in the future will continue to receive medical and hospital care and treatment furnished by the United States of America. Plaintiff-GENE OTHON, for the sole use and benefits of the United State of America under the provisions of 42 United States Code 2651-2653 and with its express consent, asserts a claim for the reasonable value of said past and future care and treatment.

## LOSS OF FUNCTION

59.    In addition, as a result of their injuries and/or the reasonable and necessary treatment thereof, Plaintiffs-GENE OTHON and -DR. LEDING have sustained loss of physical capacity in the past and they will, in all reasonable probability, continue to suffer from such physical incapacity for a long time in the future, if not for the balance of their natural lives.

## SCARRING & DISFIGUREMENT

60.    Moreover, said injuries and/or the reasonable and necessary treatment thereof have caused or will cause scarring and/or physical disfigurement of Plaintiffs-GENE OTHON and -DR. LEDING which shall abide with them for the remainder of their lives.

## LOSS OF SPOUSAL SERVICES & CONSORTIUM

61.    As a direct and proximate result of the injuries sustained by Plaintiff-GENE OTHON,

15

Plaintiff-KRISTA OTHON has in the past and will in the future suffer loss of care, company, support, society, companionship, affection and consortium of her husband, as well as the aid of the other in every marital relationship, general usefulness, industry, services, cooperation and attention within the home and family. Moreover, Plaintiff-KRISTA OTHON has incurred in the past and will incur in the future drug, medical, hospital, nursing and other expenses for her husband's care, and she has been caused in the past and will be caused in the future to provide care and support needed by Plaintiff-GENE OTHON as a consequence of his physical and mental injuries.

**BYSTANDER DAMAGES**

62.     At the time of the event made the basis of this lawsuit, Plaintiff-KRISTA OTHON was married to Plaintiff-GENE OTHON, she was located near the scene of the event when it occurred, she witnessed the traumatic injuries suffered by her husband, and she reasonably believed that her husband would be or was seriously injured, or might die as a result. As a result, this Plaintiff suffered serious emotional distress due to the direct emotional impact caused by her seeing or hearing the incident and its impact upon her husband.

**LOSS OF PARENTAL SERVICES & CONSORTIUM**

63.     DORINA S. VOUGHT and GREGORY G. OTHON are the natural and legal children of Plaintiff-GENE OTHON. Plaintiffs-ISABELLA S. OTHON, - LILLIA R. OTHON and -OLIVIA T. OTHON are the adopted and legal children of Plaintiff-GENE OTHON and his wife, Plaintiff-KRISTA OTHON. Plaintiffs-ISABELLA S. OTHON, - LILLIA R. OTHON and -OLIVIA T. OTHON have suffered in the past and will suffer in the future the consequences of Plaintiff-GENE OTHON's injuries. By reason of the actions of Defendant described and alleged herein, Plaintiffs-ISABELLA S. OTHON, - LILLIA R. OTHON and -OLIVIA T. OTHON have sustained

16

damages, including the past and future loss of consortium, services, support, guidance, comfort, companionship and society of their father, Plaintiff-GENE OTHON. The negligence of Defendants was the cause of the injuries and damages sustained by Plaintiffs-ISABELLA S. OTHON, - LILLIA R. OTHON and -OLIVIA T. OTHON, and said injuries and damages would not have happened except for the negligence of the Defendants. The injuries and damages sustained by Plaintiffs-ISABELLA S. OTHON, - LILLIA R. OTHON and -OLIVIA T. OTHON are within the scope of the Defendant's liability and said injuries and damages arose from the same types of danger that Defendant should have avoided through safe and proper conduct.

## PUNITIVE DAMAGES

64.     The conduct of Defendant constituted a willful and wonton disregard for the rights or safety of Plaintiffs and others similarly situated, and Plaintiffs suffered actual injury and damage thereby. Therefore, Plaintiffs are entitled to punitive/exemplary damages for Defendant's dangerous and outrageous conduct.

## MISCELLANEOUS

65.     Plaintiffs seek these and all other damages to which they may be entitled, all of which have a reasonable pecuniary value within the jurisdictional limits of this Court.

66.     The amount of the Plaintiff's damages are substantial and well in excess of the jurisdictional minimums of this Court. Many elements of damage, including pain, suffering and mental anguish in the past and future; past and future physical impairment; and future lost earning capacity, cannot be determined with mathematical precision. Furthermore, the determination of many of these elements of damage is peculiarly within the province of the jury, and Plaintiffs cannot presently determine what evidence will be presented at trial. Plaintiffs do not at this time seek any

certain amount of damages for any of these particular elements of damage, but would instead rely upon the collective wisdom of the jury to determine an amount that would fairly and reasonably compensate them.

## JURY DEMAND

67.     PLAINTIFFS RESPECTFULLY REQUEST A TRIAL BY JURY, FOR WHICH THE APPROPRIATE FEE HAS BEEN PREVIOUSLY TENDERED.

## PRAYER FOR RELIEF

68.     WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that Defendant be cited to appear and answer herein and that, upon final trial of this cause, Plaintiffs have:

(A)     Judgment against the Defendant for actual damages in an amount within the jurisdictional limits of the Court;

(B)     Judgment against Defendant for punitive/exemplary damages;

(C)     Pre-judgment interest, as allowed by law;

(D)     Post-judgment interest, as allowed by law;

(E)     Costs of Court;

(F)     Costs of Suit;

(G)     Attorneys' fees; and

(H)     Such other and further relief to which Plaintiffs may be entitled.

18

Respectfully submitted,

R. Blake Brunkenhoefer
S.D. Tex. Federal I.D. No. 15559
State Bar of Texas No. 00783739
Greg W. Turman
S.D. Tex. Federal I.D. No. 16317
State Bar of Texas No. 00785123
BRUNKENHOEFER | TURMAN, P.L.L.C.
500 N. Shoreline Blvd., Suite 1100
Corpus Christi, Texas 78401-0354
Tel:    (361) 888-6655
Fax:   (361) 888-5855
(bbrunk@gulfattorneys.com)

 s/R. Blake Brunkenhoefer
*Co-counsel for Plaintiffs-OTHON (pro hac vice)*

Richard L. Eddington
State Bar of Colorado #25367
CANTAFIO EDDINGTON, P.C.
345 Lincoln Avenue, Suite 202
P. O. Box 774567
Steamboat Springs, Colorado 80477
Tel:    (970) 879-4567
Fax:   (970) 879-4511
(rickeddington@aol.com)

 s/Richard L. Eddington
*Co-counsel for Plaintiffs-OTHON (pro hac vice)*

Jeff Carter
AT0001487
JEFF CARTER LAW OFFICES, P.C.
The Plaza – Suite 260
300 Walnut Street
Des Moines, IA 50309
Tel:    (888) 845-5008
Fax:   (515) 557-1962
(jeff@jeffcarterlaw.com)

 s/Jeff Carter
*Local counsel for Plaintiffs-OTHON*

and

Brian P. Galligan
AT0002632
GALLIGAN & REID, P.C.
The Plaza – Suite 5
300 Walnut Street
Des Moines, Iowa 50309-2292
Tel:     (515) 282-3333
Fax:     (515) 282-0318
(bgalligan@galliganlaw.com)


 s/Brian P. Galligan
*Counsel for Plaintiffs-LEDING*

20

## CERTIFICATE OF SERVICE

I, R. Blake Brunkenhoefer, do hereby certify that a true and correct copy of the foregoing

document was duly served on all known counsel of record by electronic delivery and/or first class

mail to:

Patrick J. McNulty
Joseph F. Moser
GREFE & SIDNEY, P.L.C.
500 East Court Ave., Suite 200
P. O. Box 10434
Des Moines, IA 50306

John W. Patton, Jr.
Amy M. Kunzer
Zach Vaughn
PATTON & RYAN, LLC
330 N. Wabash, Suite 3800
Chicago, IL 60611

Richard L. Eddington
CANTAFIO EDDINGTON, P.C.
345 Lincoln Avenue, Suite 202
P. O. Box 774567
Steamboat Springs, Colorado 80477

Jeff Carter
JEFF CARTER LAW OFFICES, P.C.
The Plaza – Suite 260
300 Walnut Street
Des Moines, IA 50309

Brian P. Galligan
GALLIGAN & REID, P.C.
The Plaza – Suite 5
300 Walnut Street
Des Moines, Iowa 50309-2292

on this the 25th day of February, 2013.

/s/ R. Blake Brunkenhoefer
R. Blake Brunkenhoefer